IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
MAY 22, 2012 Session

## ANTHONY JEROME FULLER v. CITY OF MEMPHIS

**Direct Appeal from the Circuit Court for Shelby County**
**No. CT-005332-02      Donna M. Fields, Judge**

**No.  W2011-02300-COA-R3-CV - Filed August 8, 2012**

The trial court found that Defendant City of Memphis was not liable for injuries to Plaintiff resulting from an automobile accident in which Plaintiff's vehicle was struck by a vehicle operated by a third party.  Plaintiff appeals.  We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded**

DAVID R. FARMER, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and J. STEVEN STAFFORD, J., joined.

Charles F. Rye, Bartlett, Tennessee, for the appellant, Anthony Jerome Fuller.

Robert D. Meyers and Kathryn T. Parham, Memphis, Tennessee, for the appellee, City of Memphis.

### OPINION

This lawsuit pursuant to the Governmental Tort Liability Act ("GTLA") arises from an automobile accident that occurred in September 2001.  At approximately midnight on September 19, 2001, Antonio Gandy (Mr. Gandy), Jerome Garrett Thomas (Mr. Thomas) and Terry Hudson (Mr. Hudson), were at the Millbranch Apartments when an unidentified man allegedly displayed a gun to Mr. Hudson and Mr. Thomas.  Mr. Hudson and Mr. Thomas ran to a stolen white Chevrolet Cavalier, where Mr. Gandy was waiting in the driver's seat.  The unidentified man drove out of the apartment complex in a blue car.  Mr. Thomas shot as many as five shots into the blue car as it exited the apartment complex and turned north onto Millbranch Road.  Mr. Hudson's gun jammed as he also attempted to shoot at the blue car. After the shooting, Mr. Gandy sped south on Millbranch Road, allegedly fearing that the blue car would make a U-turn and pursue him.  Memphis Police officers heard the shots and

pursued Mr. Gandy, but were unable to stop the white vehicle. At 12:08 a.m., the shift lieutenant on duty ordered the pursuit to be discontinued.

At approximately 12:15 a.m., Plaintiff Anthony Jerome Fuller's (Mr. Fuller) vehicle exited an Exxon parking lot at Third Street and Shelby Drive. Mr. Fuller's vehicle was stuck by the white vehicle operated by Mr. Gandy, who had entered the intersection through a red light. Mr. Fuller sustained serious injuries as a result of the forceful collision. Mr. Fuller was driving on a suspended license at the time of the accident, and the blood alcohol report following the accident was .12. Mr. Thomas and Mr. Hudson died as a result of injuries sustained in the collision. Mr. Gandy pled guilty to two counts of vehicular homicide, aggravated assault, evading arrest, theft, and reckless endangerment.

On September 18, 2002, Mr. Fuller and his minor children ("Plaintiffs") filed an action for damages in the Circuit Court for Shelby County against the City of Memphis ("the City") and several police officers involved in the incident. In their complaint, Plaintiffs asserted claims arising from alleged constitutional violations and negligence. Plaintiffs removed the action to federal court in October 2002, and filed an amended complaint. In their amended complaint (hereinafter, "complaint"), Plaintiffs deleted all claims arising from federal law and asserted Mr. Fuller's injuries were proximately caused by the City's negligent acts. In December 2003, the matter was remanded to the circuit court.

In May 2009, the City moved for dismissal of Plaintiffs' claims for negligent supervision or training; loss of parental consortium; attorney's fees; punitive damages; and damages in excess of $130,000. The trial court granted the motion in June 2009. The matter proceeded on Mr. Fuller's claim that the injuries he sustained in September 2001 were proximately caused by the alleged negligence of two police officers allegedly in pursuit of Mr. Gandy when the collision occurred. Mr. Fuller asserted a claim against the City based upon vicarious liability where the officers operated the City's motor vehicles in the scope and course of their employment.

The matter was heard by the trial court sitting without a jury on March 8 and 9, 2011. The trial court found that the collision was the "sole[] responsibility" of Mr. Gandy, "who chose to recklessly operate a stolen vehicle on September 18-19, 2001, to the horrendous injury of Mr. Anthony Jerome Fuller," who incurred medical bills in excess of $141,000. The trial court found that Mr. Gandy "purposely evaded appearing in court;" that his deposition testimony contained "multiple conflicting statements;" and that his deposition testimony that an unmarked "supertrooper" had pulled beside him and intentionally bumped his car into the intersection through a red light, causing the collision with Mr. Fuller, was not credible. The trial court also found that Mr. Gandy testified that he was pursued by an unmarked vehicle, but that the City introduced evidence that no unmarked vehicles were on

duty the night of the collision. The trial court found that the police officers were not in pursuit of Mr. Gandy when the collision occurred, and that Mr. Fuller had produced no evidence to contradict the City's testimony that no police vehicles were damaged on the night the collision occurred.

The trial court additionally found that an original surveillance tape received by the City from the Exxon station could not be located; that a time gap existed in the copy provided by the City; that the collision occurred during the time gap; and that the collision accordingly was not on the tape. The trial court stated that, despite Mr. Fuller's assertion that the absence of the original tape and the time gap in the copy should be construed negatively against the City, there was no proof of any intentional destruction of evidence or that the original tape recorded the collision. The trial court made "no finding with regard to the tape except that it was not entered into proof."

The trial court further concluded that, even if it were to accept Mr. Gandy's assertion that a "supertrooper" has pursued him and intentionally bumped him into the intersection as credible, then the actions of the "supertrooper" would constitute the intentional tort of assault, and not negligence. The trial court determined that the City accordingly would not be liable for the "supertrooper's" actions under the GTLA. The trial court stated that Mr. Fuller's claim of negligent supervision and training had been dismissed, and that he had failed to assert and prove a separate and distinct claim of negligence against the City. The trial court entered judgment in favor of the City on February 15, 2010. On January 27, 2012, the trial court entered final judgment in the matter, dismissing Mr. Fuller's claims against all Defendants and affirming its February 2010 judgment in favor of the City. Mr. Fuller filed a timely notice of appeal to this Court.

## *Issues Presented*

Mr. Fuller presents the following issues for our review, as we perceive and re-word them:

(1)    Whether the trial court erred by finding that the City was not negligent on September 19, 2001.

(2)    Whether the trial court erred by finding that the collision on September 19, 2001, was not caused by the negligence of the City.

(3)    Whether the trial court erred by not finding that the City had spoliated evidence contained on the surveillance tape and by refusing to draw an adverse inference against the City with respect to the missing tape

-3-

segments.

(4)     Whether the trial court erred by finding Mr. Gandy's testimony was not credible.

(5)     Whether the trial court erred by failing to make findings with respect to the testimony of a witness who testified to seeing a white vehicle being chased by police cars prior to the collision.

(6)     Whether the trial court erred by finding that, had a police officer reinitiated pursuit of Mr. Gandy, the officer's actions were reasonable.

### *Standard of Review*

Our standard of review is well-established.  We review the trial court's findings of fact *de novo* upon the record, presuming them to be correct unless the evidence preponderates otherwise.  *Mitchell v. Fayetteville Public Utilities*,  S.W.3d , 2012 WL 1593122, at *4 (Tenn.  May 8, 2012)(quoting Tenn Code Ann. § 50–6–225(e)(2) (2008)).  We afford "considerable deference" to the trial court's determination of witness credibility and the weight of the testimony when the trial court "had the opportunity to observe the witness' demeanor and to hear in-court testimony." *Id*. (citing *Whirlpool Corp. v. Nakhoneinh*, 69 S.W.3d 164, 167 (Tenn. 2002)).  However  this deference is not extended to a trial court's findings based on depositions and other documentary evidence. *Id.* (citing *Orrick v. Bestway Trucking, Inc.*, 184 S.W.3d 211, 216 (Tenn. 2006)).  When reviewing deposition testimony, we are in the same position as the trial court and may, therefore, draw our own conclusion as to the credibility and weight of the evidence.  *Pittman v. City of Memphis,* 360 S.W.3d 382, 388 (Tenn. Ct. App. 2011)(citation omitted).  We review the trial court's conclusions on matters of law *de novo*, with no presumption of correctness.  *Id*. (citing *Layman v. Vanguard Contractors, Inc.*, 183 S.W.3d 310, 314 (Tenn. 2006)).

### *Discussion*

The first issue which must be addressed in this case, as we perceive it, is whether the evidence preponderates against the trial court's finding that City police officers were not in pursuit of Mr. Gandy when Mr. Gandy entered the intersection of Third Street and Shelby Drive and collided with Mr. Fuller's vehicle.  According to the City, the police pursuit of Mr. Gandy ended at 12:08 a.m., and there was no evidence that the pursuit was recommenced prior to the collision.  The City also asserts that no unmarked vehicles were on patrol the night of the collision, and that no police vehicle collided with the vehicle operated by Mr. Gandy, causing him to collide with Mr. Fuller.  Mr. Fuller, on the other hand, asserts that the

trial court erred by not finding Mr. Gandy's testimony that he was pursued by police officers at the time of the collision and was forced into the intersection by a "supertrooper" to be credible.

Upon review of the record, we find that Mr. Gandy's statements regarding the number of police cars that allegedly pursued him, and regarding whether the cars were marked or unmarked, to be inconsistent at best. Mr. Gandy's testimony included statements that he was "talking about a Memphis Police Department car, white with the blue on it, yellow, whatever, however it is." Mr. Gandy stated that, shortly after exiting the apartment complex parking lot, he saw "about seven, eight, nine police cars all behind us." Mr. Gandy also made inconsistent statements regarding when a police vehicle allegedly "bumped" the vehicle operated by him. He stated that the police car "bumped" the rear of the vehicle, causing him to "spin[] out," and that he "regained control, and . . . went through, on through traffic." He stated, "[a]nd that's when we got hit." Mr. Gandy stated later in the deposition, however, that the "police car was, like, what, two or three cars behind us, something like that, within a little distance" and that it "swerved over behind us like that and bumped us," and that he never regained control of the vehicle.

The record also contains a discussion between counsel and the trial court regarding the admissibility of additional inconsistent statements made by Mr. Gandy. Plaintiff's counsel agreed to stipulate that Mr. Gandy gave "several different versions of the story throughout the investigation." In light of the stipulated inconsistencies in Mr. Gandy's testimony, we agree with the trial court that Mr. Gandy's testimony was not credible.

We accordingly turn to Mr. Fuller's assertion that the trial court erred by not drawing an adverse inference from the unavailability of certain segments of a surveillance video given to the police by the Exxon station at which Mr. Fuller had stopped just prior to the collision. It is undisputed that the Exxon station provided the original surveillance tape to the City; that the tape had been copied; that the original tape could not be located; and that the copy of the tape available did not include the time of the accident. The City argues that there is no way to know what the missing segments contain, or whether the original tape recorded the exact time frame at all. The trial court made no finding based on the tape, other than to note that it was not entered into proof. The trial court stated:

Plaintiff speculates that the Memphis Police Department destroyed the relevant tape. One could just as easily speculate that there was no tape recording running at the moment of the wreck. The Court heard no proof of the existence of or destruction of any tapes[.]

The former Exxon station employee who was the station manager in September 2001

testified at trial that her manager had instructed her to provide the surveillance tapes, but that she could not recall to whom she gave them. She could not recall how many tapes she provided, or the dates of the tapes. She testified that the tapes were provided within days of the requested date and that she had no difficulty locating them. She further testified that the station's surveillance tapes generally contained surveillance of the sales transactions and the interior and exterior of the Exxon station. The Exxon employee further testified that "we were supposed to have closed out at 12:00. But if you didn't close out, it would close out for itself. And during the close-out, sometimes there would be other transactions[.]" The employee testified that she did not know what the tape contained, and that she had not viewed it. The City acknowledged that it had obtained the tapes and did not object to the chain of custody or authenticity.

Mr. Fuller asserts the trial court erred by not drawing an adverse inference based upon the doctrine of spoliation of evidence. Under the doctrine of spoliation of evidence, a court may "draw a negative inference against a party that has intentionally, and for an improper purpose, destroyed, mutilated, lost, altered, or concealed evidence." *Bronson v. Umphries*, 138 S.W.3d 844, 854 (Tenn. Ct. App. 2003). The negative inference is rebuttable, however, and only arises "when the spoliation occurs in circumstances indicating fraud and a desire to suppress the truth. It does not arise when the destruction was a matter of routine with no fraudulent intent." *McLean v. Bourget's Bike Works, Inc.*, No. M2003-01944-COA-R3-CV, 2005 WL 2493479, at* 4 (Tenn. Ct. App. Oct.7, 2005). The party asserting the doctrine carries the burden to demonstrate intentional spoliation of evidence. *Foley v. St. Thomas Hosp.*, 906 S.W.2d 448, 454 (Tenn. Ct. App. 1995.

We agree with the trial court that there is simply nothing in the record to demonstrate that the City deleted segments of the Exxon surveillance tape. As the trial court observed, there is no proof to suggest that the original tapes in fact recorded any part of the collision, or that the tapes were recording at the time the collision occurred. There is nothing to demonstrate that the copy entered into evidence is not a true and exact copy of the original tape provided some ten years earlier, or that the original was intentionally lost or destroyed. Accordingly, the trial court did not err by refusing to draw a negative inference based on the doctrine of spoliation of evidence in this case.

Mr. Fuller additionally asserts that the trial court erred by excluding certain statements made by a witness to the collision to Memphis Police Sergeant Brad Webb ("Sgt. Webb") on the basis that it was hearsay within hearsay.[1] We observe that, during Mr. Fuller's redirect examination of Sgt. Webb, a lengthy discussion took place between counsel and the trial court regarding the admissibility of the witness statement, and Plaintiff's counsel conceded,

---

[1] The parties stipulated that the witness died in 2008.

[w]ell, you Honor, I did probably go beyond what was necessary because he has already answered my question about police involvement.

This issue is without merit.

Memphis Police Lieutenant Raymond Miles ("Lt. Miles") testified that he was the shift lieutenant on duty and monitored the radio transmissions of the incident. Lt. Miles testified that it was his duty to decide whether a chase should be pursued, and that the chase was pursued for two or three minutes before he discontinued it. He testified that he transmitted the order to call off the chase "around midnight" and that at approximately 20 minutes after midnight Officer Clinton Langham (Officer Langham) radioed that "somebody had told him about an accident." Lt. Miles testified that officers from the delta and alpha shifts overlapped from 11:00 p.m. until 1:00 a.m.; that both shifts shared the same frequency; and that the officers from both shifts were required to obey his command. Lt. Miles testified that Officer Robert Johnson ("Officer Johnson") who had heard the shots fired from the white car; followed the white car operated by Mr. Gandy; reported the incident; initially pursued Mr. Gandy and attempted to get him to pull over; radioed that he was terminating the pursuit "at Winchester and Elvis Presley." Lt. Miles testified that he ordered the officers to "break it off," and that the order was confirmed by the dispatcher. Lt. Miles testified that the voice on the radio tape played at the trial of the matter was that of the dispatcher, and that the dispatcher indicated it was "[e]ight minutes after midnight" when the pursuit was discontinued. The tape of Officer Johnson's conversation with the dispatcher indicated that Officer Johnson had discontinued pursuit and was on route to the South Precinct on Raines Road.

Lt. Miles testified that he went to the scene of the accident at Third Street and Shelby Drive, and that there were no police cars at the scene that appeared to have been damaged. He testified that, to the best of his knowledge, no police cars were involved in the accident. Lt. Miles further testified that he was not aware of any evidence that any officer was "paralleling the pursuit," or pursing on parallel street or just following the pursuit. He further testified that no unmarked cars were working that night, and that unmarked cars are not permitted to pursue in any situation. Lt. Miles testified that Officer Johnson was in a marked squad car.

Officer Langham testified that someone flagged him down on Horn Lake and Shelby Drive to tell him about the accident at Shelby Drive and Third Street. He testified that he was no more than two miles from the site of the accident, and that when he arrived at the scene he observed the two vehicles. When asked whether he "observe[d] or [made] any observations that would lead [him] to believe that the accident was caused by a police chase," Officer Langham testified, "No."

In the portion of his deposition read into the record at the trial of this matter, Mr. Fuller stated that he did not recall seeing the vehicle that collided with his vehicle. He also stated that he had no proof that any officer was driving in excess of the posted speed limits immediately before the accident.

Officer Marcus Mosby ("Officer Mosby") testified that he was driving a marked squad car on the night of the collision. He testified that when he left the precinct he observed three or four squad cars traveling northbound on Graceland, and that he went in the same direction a short distance behind the others. Officer Mosby confirmed the radio transmission wherein Officer Johnson reported that the white vehicle appeared to have "wrecked out" on Winchester near Elvis Presley, and testified that he turned off Graceland and went to Old Hickory and traveled up Elvis Presley because he did not want to get "tied up on the accident." He further confirmed that Officer Johnson then reported that the white vehicle was still moving, and that when Officer Johnson approached Winchester and Elvis Presley Lieutenant Miles ended the pursuit.

Officer Mosby testified that he traveled to Marty Cove off Neely to check on his grandmother's house, and that when he left Neely he traveled to Fairway and turned left onto Third Street. Office Mosby testified that when he was stopped at the traffic light at Fairway and Third he saw "a white vehicle southbound on Third Street at a high rate of speed." He testified that no police cars were following the white vehicle, and that no police cars were behind him when he turned onto Third Street. Office Mosby further testified that he obtained a description of the white vehicle from the dispatcher, and that he reported that the white vehicle had "just passed [him] going southbound on Third." He testified that he traveled south on Third, that other traffic was present, and that when he "topped the hill" near Levy he was unable to determine whether the white vehicle had turned onto Levy or continued down Third Street. He testified that he did not have his lights or siren on, and that he slowed down to try to determine whether the white vehicle had turned onto Levy. Officer Mosby testified that he did not see the white vehicle on Levy, that he continued southbound on Third, and turned off onto Western Park to go to his home in order to "get some equipment." He testified that he was at his home when he heard the radio transmission of the accident, and that he traveled to the accident scene eastbound on Shelby Drive. Officer Mosby testified that he traveled to the scene of the accident and assisted the officer there. Office Mosby testified that his squad car was not damaged on the night of the accident.

Upon review of the entire record in this case, we find no evidence that would preponderate against the trial court's finding that Mr. Gandy's actions were the sole cause of the collision on September 19, 2001, and that the police officers did not act negligently. There is no proof to corroborate Mr. Gandy's allegation that he was being pursued by police when he sped through the red light at Third Street and Shelby Drive, or that an unmarked

"supertrooper" intentionally "bumped" the white vehicle, causing it to collide with Mr. Fuller's vehicle. We agree with the trial court's assessment that Mr. Gandy's testimony is not credible. Mr. Fuller has simply failed to carry his burden to demonstrate that police officers acted negligently in this case, or that the actions of the City's police officers caused the horrible and unfortunate collision on September 19. Remaining issues are pretermitted as unnecessary in light of our disposition of this matter.

### *Holding*

In light of the foregoing, we affirm the judgment of the trial court. This matter is remanded to the trial court for enforcement of the judgment and the collection of costs. Costs of this appeal are taxed to the appellant, Anthony Jerome Fuller, and his surety, for which execution may issue if necessary.


_____
DAVID R. FARMER, JUDGE